IN RE INQUIRY CONCERNING JUDGE W. MILTON NOWELL

No. 95

(Filed 12 September 1977)

1. **Judges § 7— nature of proceeding before Judicial Standards Commission**
    A proceeding before the Judicial Standards Commission is neither a civil nor a criminal action but is merely an inquiry into the conduct of one exercising judicial power to determine whether he is unfit to hold a judgeship; its aim is not to punish the individual but to maintain the honor and dignity of the judiciary and the proper administration of justice.

2. **Judges § 7— censure or removal of judge—due process**
    Because of the severe impact which adverse findings by the Judicial Standards Commission and censure or removal by the Supreme Court may reasonably be expected to have upon the individual judge, fundamental fairness entitles the judge to a hearing which meets the basic requirements of due process.

3. **Judges § 7— censure or removal of judges—passage of statutes prior to enabling constitutional amendment**
    Article 30 of G.S. Ch. 7A, which provides a procedure for the censure or removal of a judge, is not unconstitutional because it was enacted prior to the time the constitutional amendment authorizing its enactment was ratified by the people, since the General Assembly had the power to pass a statute in anticipation of a constitutional amendment and to provide that it would take effect upon the adoption of the constitutional amendment, and the General Assembly which enacted Article 30 so provided.

4. **Judges § 7— censure or removal of judge—Judicial Standards Commission—no delegation of legislative authority**
    Statutes providing a procedure for the censure or removal of a judge, Article 30 of G.S. Ch. 7A, do not constitute an improper delegation of legislative authority to an administrative agency, the Judicial Standards Commission.

235

5. **Judges § 7— grounds for censure or removal—vagueness of statute**

Portions of G.S. 7A-376 providing for the censure or removal of a judge for "wilful misconduct in office" or "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" are not unconstitutionally vague.

6. **Judges § 7— censure or removal of judge—Code of Judicial Conduct**

The General Assembly intended the North Carolina Code of Judicial Conduct to be a guide to the meaning of the statute providing the grounds for censure or removal of a judge, G.S. 7A-376.

7. **Judges § 7— Judicial Standards Commission—discretion to investigate complaints and accept evidence**

Statutes providing the procedure for the censure or removal of a judge do not illegally vest unguided and absolute discretion in the Judicial Standards Commission to choose which complaints to investigate and what evidence it will accept.

8. **Judges § 7— Judicial Standards Commission—investigative and judicial functions —due process**

The combination of investigative and judicial functions in the Judicial Standards Commission does not violate a respondent judge's due process rights under either the federal or North Carolina constitutions, since the Commission can neither censure nor remove a judge but is only an administrative agency created as an arm of the court to conduct hearings for the purpose of aiding the Supreme Court in determining whether a judge is unfit or unsuitable.

9. **Judges § 7— censure or removal of judge—findings by Judicial Standards Commission—scope of review in Supreme Court**

In reviewing a recommendation of the Judicial Standards Commission, the Supreme Court is not bound by findings of the Commission supported by substantial evidence but will make an independent evaluation of the evidence adduced before the Commission.

10. **Judges § 7— proceedings before Judicial Standards Commission—quantum of proof**

The quantum of proof in proceedings before the Judicial Standards Commission is proof by clear and convincing evidence—a burden greater than that of proof by a preponderance of the evidence and less than that of proof beyond a reasonable doubt.

11. **Judges § 7— wilful misconduct in office defined**

"Wilful misconduct in office" is the improper or wrongful use of the power of his office by a judge acting intentionally, or with gross unconcern for his conduct, and generally in bad faith.

12. **Judges § 7— wilful misconduct in office—bad faith**

While the term "wilful misconduct in office" necessarily would encompass conduct involving moral turpitude, dishonesty, corruption and any knowing misuse of the office, whatever the motive, these elements are not necessary to a finding of bad faith, since a specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith.

**13. Judges § 7— conduct prejudicial to the administration of justice**

   Wilful misconduct in office of necessity is "conduct prejudicial to the administration of justice that brings the judicial office into disrepute"; however, a judge may also, through negligence or ignorance not amounting to bad faith, behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute and may also commit indiscretions, or worse, in his private life so as to bring the judicial office into disrepute.

**14. Constitutional Law § 32— criminal case—disposition in open court**

   The trial and disposition of criminal cases is the public's business and ought to be conducted in open court. N.C. Const., Art. I, § 18.

**15. Judges § 7— failure to give prosecutor opportunity to be heard—Code of Judicial Conduct**

   A criminal prosecution is an adversary proceeding in which the prosecuting attorney and defendant are entitled to be present and to be heard, and failure to accord the prosecutor such opportunity violates the North Carolina Code of Judicial Conduct, Canon 3A(4).

**16. Judges § 7— censure of judge—ex parte disposition of criminal cases—"waiverable" offenses—actions not furtive or corrupt—practice of other judges**

   There is no merit in a judge's contention that he should not be censured for his ex parte disposition of two traffic cases out of court by ordering a deputy clerk of court to enter in each case "a prayer for judgment continued upon payment of the costs" because (1) the traffic offenses were "waiverable" before the clerk or a magistrate; (2) he could have entered the same judgments in open court; (3) his conduct was not directed toward any personal gain; and (4) it had been the practice of other judges in the district to dispose of cases out of court.

**17. Judges § 7— ex parte disposition of criminal case—conduct prejudicial to administration of justice**

   The ex parte disposition of a criminal case out of court, or the disposition of any case for reasons other than an honest appraisal of the facts and law as disclosed by the evidence and the advocacy of both parties, will amount to conduct prejudicial to the administration of justice.

**18. Judges § 7— misconduct in office—ex parte disposition of criminal cases outside courtroom—censure by Supreme Court**

   A district court judge is censured by the Supreme Court for wilful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute because of his disposition of two traffic cases outside the courtroom by entry of prayers for judgment continued when the court was not in session and without notice to the district attorney since he (1) improperly deprived the district attorney of the opportunity to participate in the disposition of the cases; (2) improperly removed the proceedings from the public domain; and (3) violated Canon 3A(4) of the North Carolina Code of Judicial Conduct.

   Justice LAKE dissenting.

   THIS matter is before the Court upon the recommendation of the Judicial Standards Commission (Commission) that Judge W.

Milton Nowell, a judge of the General Court of Justice, District Court Division, Eighth Judicial District, be censured for "wilful misconduct in office" and "conduct prejudicial to the administration of justice which brings the judicial office into disrepute," as these phrases are used in Article IV, § 17(2) of the North Carolina Constitution and in N.C. Gen. Stats. 7A-376 (Cum. Supp. 1975). The recommendation, filed in the Supreme Court on 30 March 1977, was argued on 14 July 1977 as Case #119.

*Duke and Brown; Hulse and Hulse; and Thomas J. White, Jr., for Judge W. Milton Nowell, respondent.*

*Attorney General Rufus L. Edmisten; Deputy Attorney General Millard R. Rich, Jr.; and Associate Attorney James E. Scarbrough for the Judicial Standards Commission.*

SHARP, Chief Justice.

A citizen having filed written charges against Judge Nowell (respondent), the Commission directed an investigation in accordance with G.S. 7A-377 and the Commission's Rule 7. Thereafter, on 1 August 1976, this proceeding was begun before the Commission by the filing of a complaint, verified by Millard R. Rich, Jr., Deputy Attorney General, whom the Commission appointed as special counsel (Commission Rule 8, 10). The complaint alleged that respondent had engaged in wilful misconduct in office and in conduct prejudicial to the administration of justice that brings the judicial office into disrepute. The charges were that on 10 May 1976, prior to the opening of the criminal session of the District Court of Wayne County over which respondent was to preside, he disposed of two specified cases in the office of the Clerk of the Superior Court without notice to the prosecuting attorney for the State and in his absence. In each case the defendant was charged with a violation of the motor vehicle law and, as to each, respondent ordered the deputy clerk of the court to enter "a prayer for judgment continued upon payment of the costs."

In his answer, respondent's first defense was a motion to dismiss the complaint on the ground that the statute under which the Commission was attempting to proceed violated N.C. Const., Art. I, § 19 and U.S. Const. amend. XIV. As a second defense he denied the allegations of the complaint. As a third, or "further defense," he averred that the defendant Grantham was a high school student whose mother was employed and that he desired to minimize the time the boy and his mother would lose from school and work respectively. As to the defendant West, he alleged that a deputy sheriff had given him a "high recommendation."

In accordance with its rules, promulgated in 283 N.C. 764, *et seq.* (1973) and 288 N.C. 738 *et seq.* (1975), on 15 October 1976 the full Commission conducted a plenary hearing upon the charges contained in the complaint. Special Counsel Rich presented the evidence in support of the charges. Respondent, represented by his attorney of record, offered evidence and testified in his own behalf.

Thereafter the Commission made written findings of fact from which it concluded "as a matter of law" that the conduct of respondent detailed therein "constituted wilful misconduct in office and conduct prejudicial to the administration of justice, which brings the judicial office into disrepute." The specific findings upon which the Commission based these findings are the following:

"7. That Respondent was scheduled to preside over the District Court of Wayne County, Criminal Division, on May 10, 1976. That prior to the opening of court on said date, while in the office of the Clerk of Superior Court of Wayne County, Respondent, in Case #76CR3975, STATE v. DON CHRISTOPHER WEST, wherein Don Christopher West was charged with unlawfully and wilfully operating a motor vehicle on a public street or highway at a speed of 50 miles per hour in a 35 mile per hour zone, directed Mrs. Evelyn Edgerton, Deputy Clerk of Superior Court, who works in the Criminal District Court Division of the Clerk's Office, to enter a prayer for judgment continued upon the payment of costs and that Mrs. Edgerton did so enter said judgment. That at the time Respondent directed Mrs. Edgerton to enter said Judgment, and at the time said judgment was entered, the defendant Don Christopher West was not present, the defendant was not represented by counsel, the entry was not made in open court, the Assistant Solicitor who was prosecuting the criminal document on said date, Paul Wright, was not present and had no prior knowledge that such entry would be made.

"8. That Respondent, on May 10, 1976, in the offices of the Clerk of Superior Court of Wayne County, prior to the opening of the Criminal Division of the District Court of said County on said date, directed Mrs. Evelyn Edgerton, Deputy Clerk of Superior Court, to enter a prayer for judgment continued upon the payment of costs in Case #76CR4219, wherein James Randall Grantham was charged with unlawfully and wilfully operating a motor vehicle on a public street or highway 70 miles per hour in a 55 mile per hour zone. That the said entry was made by Mrs. Edgerton as directed by Respondent. That at the time said entry was made by Mrs. Edger-

ton at the direction of Respondent, said entry was not made in open court, was not made in the presence of the defendant James Randall Grantham, nor in the presence of an attorney representing Grantham, and was made without the knowledge and consent of Assistant Solicitor Paul Wright, who was prosecuting the criminal docket in District Court in said County on said date.

"9. That the aforesaid FINDINGS and this RECOMMENDATION were concurred in by five or more members of the Judicial Standards Commission."

Upon the foregoing findings and conclusions, the Commission recommended to the Supreme Court "that respondent be censured for said conduct."

In our consideration of the Commission's recommendation we begin with respondent's "first defense," *i.e.*, that the statutory authority under which the Commission proceeded, Art. 30, ch. 7A, N.C. Gen. Stats. (G.S. 7A-375, -377, (1975 Cum. Supp.)), hereinafter referred to as Article 30, violates the constitutional guarantees of due process, N.C. Const., Art. I, § 19, and U.S. Const., amend. XIV. Respondent contends:

(a) Article 30 is invalid because it was enacted prior to the time the constitutional amendment authorizing its enactment was ratified by the people.

(b) Article 30 constitutes an attempt by the General Assembly to abrogate "its legislative duties by unconstitutionally delegating them to an administrative agency, the Judicial Standards Commission," without providing any standards for the censure and removal of judges.

(c) The terms "wilful misconduct" and "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" are so vague as to be meaningless.

(d) The Commission combines the roles of prosecutor, judge and jury.

Before considering the foregoing contentions seriatim, we deem it appropriate to note the following pertinent facts:

At the general election on 7 November 1972 the voters of the State approved an amendment which rewrote N.C. Const. Art. IV, § 17. As rewritten, Art. IV, § 17(1) authorizes the General Assembly, after notice, to remove a Justice or Judge of the General Court of Justice for mental or physical incapacity by joint resolution

of two-thirds of all the members of each house. It further provides that removal from office by the General Assembly for any other cause shall be by impeachment. Article IV, § 17(2) *requires* the General Assembly to prescribe a procedure, in addition to impeachment and address set forth in (1), for the removal of a Justice or Judge for permanent mental or physical incapacity "and for the censure and removal of a Justice or Judge for wilful misconduct in office, wilful and persistent failure to perform his duties, habitual intemperance, conviction of a crime involving moral turpitude, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute." In compliance with the foregoing constitutional mandate the General Assembly created our Judicial Standards Commission by the enactment of Article 30.

Over twenty jurisdictions have established commissions similar to ours. *See In re Diener*, 268 Md. 659, 662, 304 A. 2d 587, 589 (1973); Note, *Judicial Discipline—The North Carolina Commission System*, 54 N.C. L. Rev. 1074 (1976); American Judicature Society, Judicial Disability and Removal Commissions, Courts and Procedures (1972). The supreme courts of a number of these states have previously met the contentions made by respondent, and we are aided by their decisions.

[1]   As pointed out in our previous decisions, a proceeding begun before the Commission is neither a civil nor a criminal action. *In re Crutchfield*, 289 N.C. 597, 223 S.E. 2d 822 (1975); *In re Edens*, 290 N.C. 299, 226 S.E. 2d 5 (1975). *Compare In re Gilliand*, 248 N.C. 517, 103 S.E. 2d 807 (1958). Such a proceeding is merely an inquiry into the conduct of one exercising judicial power to determine whether he is unfit to hold a judgeship. Its aim is not to punish the individual but to maintain the honor and dignity of the judiciary and the proper administration of justice. *In re Diener, supra; In re Kelly*, 238 So. 2d 565, 569 (Fla. 1970); *Sharpe v. State ex rel.* Oklahoma Bar Association, 448 P. 2d 301 (Okla. 1968); *In re Brown*, 512 S.W. 2d 317 (Texas 1974). *See Memphis & Shelby County Bar Association v. Vick*, 40 Tenn. App. 206, 290 S.W. 2d 871, 875 (1955). Albeit serious, censure and removal are not to be regarded as punishment but as the legal consequences attached to adjudged judicial misconduct or unfitness. *Sharpe v. State ex rel.* Oklahoma Bar Association, *supra*.

[2]   Notwithstanding, because of the severe impact which adverse findings by the Commission and censure or removal by the Supreme Court may reasonably be expected to have upon the individual, fundamental fairness entitles the judge to a hearing which meets the

basic requirements of due process. *In re Diener, supra.* "The Commission's procedures are required to meet constitutional due process standards since a judge's interest in continuing in public office is an individual interest of sufficient importance to warrant constitutional protection against deprivation." *In re Hanson,* 532 P. 2d 303, 305 (Alas. 1975); *In re Haggerty,* 257 La. 1, 241 So. 2d 469 (1970). We therefore consider respondent's due process contentions seriatim:

[3] (a) Respondent's contention that the General Assembly was without authority to enact Article 30 in advance of the ratification of N.C. Const., Art. IV, § 17 is untenable. This Court had previously ruled that "[t]he General Assembly has power to enact a statute not authorized by the present Constitution where the statute is passed in anticipation of a constitutional amendment authorizing it or provides that it shall take effect upon the adoption of such constitutional amendment." *Fullam v. Brock,* 271 N.C. 145, 149, 155 S.E. 2d 734, 739-40 (1967). The legislature which enacted Article 30 so provided. 1971 Sess. Laws, ch. 590, § 3. Thus the Act became effective 1 January 1973.

[4] (b) In view of the constitutional mandate in N.C. Const. Art. IV, § 17(2) that the General Assembly *shall prescribe* a procedure for the censure and removal of judges in addition to impeachment and address as provided in § 17(1), respondent's contention that the General Assembly in enacting Article 30 "abrogated its legislative duties by unconstitutionally delegating them to the Commission, a creature of the General Assembly," is obviously without merit. It is, of course, a fundamental principle of constitutional law that the General Assembly may not delegate its law-making authority to a subordinate administrative agency. However, it is equally well settled that "once the legislature has declared the policy to be adhered to by the administrative agency; the framework of the law to be followed; and the standards to be used in applying the law, the authority to make factual determinations in applying the law may be delegated to an agency." *Hospital v. Davis,* 292 N.C. 147, 158, 232 S.E. 2d 698, 705 (1977).

[5] (c) Respondent insists, however, that the General Assembly failed to provide *any* standards for the guidance of the Commission in determining whether a judge has been guilty of either "wilful misconduct in office" or "conduct prejudicial to the administration of justice that brings the judicial office into disrepute"; that a recommendation of censure or removal is a matter left to the Com-

mission's absolute and unguided discretion. We have previously said without elaboration in *In re Edens, supra* at 305-306, 226 S.E. 2d at 9, that the phrases quoted above are not unconstitutionally vague or overbroad. We now point out that they are "no more nebulous or less objective than the reasonable and prudent man test which has been a part of our negligence law for centuries." *In re Foster*, 271 Md. 449, 476, 318 A. 2d 523, 537 (1974).

In *Sarisohn v. Appellate Division*, 265 F. Supp. 455 (D.C. 1967), a case in which a section of the New York Constitution was unsuccessfully attacked as void for vagueness, Judge Bartels emphasized the futility of an attempt to enumerate in any statute or rule all the possible grounds for removal of a judicial officer. "Guidelines," he said, "may be found in the Canons of Ethics, applicable to both attorneys and judges, adopted by the American Bar Association and other bar associations, and also in the general moral and ethical standards expected of judicial officers by the community. . . . 'Cause' and similarly broad standards have been upheld against the charge of vagueness as used in numerous statutes, to justify removal from office or denial of license privileges." *See Keiser v. Bell*, 332 F. Supp. 608 (E.D. Pa. 1971); *Spruance v. Commission on Judicial Qualifications*, 13 Cal. 3rd 778, 532 P. 2d 1209, 119 Cal. Rptr. 841 (1975); *In re Diener*, 268 Md. 659, 671, 304 A. 2d 587, 594.

[6] Specific guidelines for judicial officers of North Carolina are to be found in the North Carolina Code of Judicial Conduct, adopted by this Court on 26 September 1973 and published in 283 N.C. 771. (Subsequent amendments with reference to compensation for extra-judicial activity and political activity, adopted on 30 December 1974 and 16 March 1976, are published in 286 N.C. 729 (1975) and 289 N.C. 733 (1976).) The General Assembly intended the North Carolina Code of Judicial Conduct to be a guide to the meaning of the statute. *See* North Carolina Courts Commission, Report to the General Assembly 28 (1971) and also Note, 54 N.C. L. Rev. *supra* at 1081 (1976).

Surely respondent cannot seriously maintain that he, a lawyer licensed in 1960 and a judge with six years' experience, had no notice of what conduct was expected of him. Respondent's contention that Article 30 is unconstitutionally vague is overruled.

[7] There is likewise no merit in the contention that Article 30 illegally vests unguided and absolute discretion in the Commission to choose which complaints to investigate and what evidence it will accept. Any administrative agency empowered to investigate com-

plaints and allegations of wrongdoing must have a broad discretion if it is to function at all. The General Assembly is no more required to hobble the Commission with statutory guidelines for the exercise of its investigative powers than it is to prescribe such limitations for our district attorneys. Further, it is necessary to keep in mind that the penalties ultimately assessed against any judge under Article 30 are not criminal and that it is this Court, not the Commission, which assesses them.

[8]   (d) Respondent's contention that Article 30, which allows the Commission to conduct a preliminary investigation, find facts, and make a recommendation to the Supreme Court, denied him the impartial tribunal which is an essential of due process has been rejected by all jurisdictions which have considered it. It is well settled by both federal and state court decisions that a combination of investigative and judicial functions within an agency does not violate due process. An agency which has only the power to recommend penalties is not required to establish an independent investigatory and adjudicatory staff. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed. 2d 842 (1971); *Federal Trade Commission v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1947); *Keiser v. Bell*, 332 F. Supp. 608 (E.D. Pa. 1971); *In re Hanson*, 532 P. 2d 303, 306 (Alas. 1975); *In re Kelly*, 238 So. 2d 565 (Fla. 1970); *In re Haggerty*, 257 La. 1, 241 So. 2d 469 (1970); *In re Diener*, 268 Md. 659, 304 A. 2d 587 (1973); *In re Brown*, 512 S.W. 2d 317, 321 (Tex. 1974); 2 K. Kavis, Administrative Law § 13.02 (1968); 54 N.C. L. Rev. *supra* at 1079.

We again emphasize, as have all the courts which have considered this identical contention, that the Commission can neither censure nor remove a judge. It is an administrative agency created as an arm of the court to conduct hearings for the purpose of aiding the Supreme Court in determining whether a judge is unfit or unsuitable. To that end it is authorized to investigate complaints, hear evidence, find facts, and make a recommendation thereon. *In re Kelly, supra* at 569; *Keiser v. Bell, supra* at 616. Its recommendations are not binding upon the Supreme Court, which will consider the evidence of both sides and exercise its independent judgment as to whether it should censure, remove or decline to do either. In the words of the Texas Supreme Court, "Any alleged partiality of the Commission is cured by the final scrutiny of this adjudicatory body." *In re Brown, supra* at 321. We also note that the Commission's investigator and special prosecutor are employees of the Commission and not voting members. Accordingly, we hold that the combination of investigative and judicial functions in the Commis-

sion did not violate respondent's due process rights under either the federal or North Carolina constitutions.

Additionally, our review of the entire record discloses no procedural irregularity upon which a claim of denial of procedural due process could be maintained. The findings and recommendation of the Commission were made after an investigation and with such notice, opportunity to answer, and hearing as would constitute due process. Finally, we note that neither allegations nor evidence adduced disclose elements of discrimination or improper classification which suggest a denial of the equal protection of the laws. *See Keiser v. Bell*, 332 F. Supp. 608, 615-16 (E.D. Pa. 1971).

We now consider respondent's contentions that the evidence does not support the Commission's findings of fact and that its findings do not justify its recommendation that he be censured for wilful misconduct in office or conduct prejudicial to the administration of justice which brings the judicial office into disrepute.

In *In re Crutchfield, supra, In re Edens, supra,* and *In re Stuhl*, 292 N.C. 379, 233 S.E. 2d 562 (1977), the three cases which have heretofore come to us upon the Commission's recommendations of censure, the conduct for which the judges involved were censured was either admitted or established by uncontradicted "substantial evidence." In these cases we either "accepted" or "affirmed" the Commission's findings without discussing the force and effect of these findings upon the Court's consideration of the recommendation or the quantum of proof applicable in an inquiry into the conduct of a judge. However, we now deem it appropriate to consider and determine both the standard of proof and the effect of the Commission's findings.

The first judicial standards (or qualification) commission was established in California by constitutional amendment in 1960 (Cal. Const. Art. VI, §§ 8, 18). Like many other jurisdictions, North Carolina used the California plan as the model for its own Commission. 54 N.C. L. Rev. *supra* at 1075. Since there is no material difference between our Article 30 and the corresponding sections of Cal. Const. Art. VI, § 18, it is fitting that before we determine any question arising under Article 30, we ascertain how California has answered it.

[9] In deciding "the appropriate standard" for the Court to employ in reviewing a recommendation by the Commission, the California Court rejected the substantial evidence test, that is, the proposition

that Commission findings are binding upon the Court if supported by substantial evidence, even though other record evidence would support findings to the contrary. The Court said:

"Under such a standard of review, we would not be free to disregard the Commission's findings merely because the circumstances involved might also be reasonably reconciled with contrary findings of fact. . . . [S]ince the ultimate, dispositive decision to censure or remove a judge has been entrusted to this court, we conclude that in exercising that authority and in meeting our responsibility we must make our own, independent evaluation of the record evidence adduced below. After conducting such a review we may then decide as a question of law whether certain conduct, which we may have found as fact to have occurred, was 'wilful misconduct in office' or 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute.' . . . Finally, it is to be our findings of fact and conclusions of law, upon which we are to make our determination of the ultimate action to be taken, to wit, whether we should dismiss the proceedings or order the judge concerned censured or removed from office." *Geiler v. Commission on Judicial Qualifications*, 10 Cal. 3rd 270, 276, 515 P. 2d 1, 4, 110 Cal. Rptr. 201, 204 (1973).

The Supreme Court of Texas followed the California Court's rationale. The Texas constitution, it said, "empowers the Commission to 'recommend to the Supreme Court the removal, or retirement, as the case may be, of the person in question. . . .' It is the Supreme Court which makes the ultimate decision. The master can hear, take evidence and make a report to the Commission. The findings of the master as well as those of the Commission lead to a recommendation by the Commission, but the term 'recommend' manifests an intent to leave the court unfettered in its adjudication. This court's constitutional responsibility cannot be abandoned by the delegation of the fact-finding power to an administrative agency or the master. This court must make its own independent evaluation of the evidence adduced below. *Geiler v. Commission on Judicial Qualifications, supra.*" *In re Brown*, 512 S.W. 2d 317, 320 (Tex. 1974). *See In re Tally*, 238 So. 2d 569, 571 (Fla. 1970).

[9]  After the decision in *Geiler, supra*, Alaska, which had initially adopted the substantial evidence test (*In re Robson*, 500 P. 2d 657 (Alas. 1972)), reviewed the decisions of other states. Upon this review it ascertained that Alaska was the only jurisdiction which had followed the substantial evidence test in reviewing commission

factual findings and concluded that the scope of Supreme Court review in a judicial qualifications proceeding should be that of an independent evaluation of the evidence. *In re Hanson*, 532 P. 2d 303 (Alas. 1975). We have reached this same conclusion.

With reference to the quantum of proof applicable to an inquiry into the fitness and conduct of a judge, the Alaska court stated: "of the courts of other jurisdictions which have considered the question of the appropriate standard of proof, all have rejected the beyond-a-reasonable-doubt standard that controls criminal prosecutions. Most of these same courts have also declined to adopt the civil preponderance-of-the-evidence standard in favor of the seemingly higher burden of proof by clear and convincing evidence." *Id.* at 307-308. In adopting this standard the Alaska court reasoned that the serious nature of proceedings which may result in the censure or removal of a judge from office requires proof by clear and convincing evidence. *Id. Accord, In re Haggerty*, 257 La. 1, 31, 241 So. 2d 469, 479; *In re Diener*, 268 Md. at 670, 304 A. 2d at 594 (1973).

[10]   In *Geiler, supra* at 275, 515 P. 2d at 4, 110 Cal. Rptr. at 204, California declared the standard of proof in an inquiry before the Commission to be "proof by clear and convincing evidence *sufficient to sustain a charge to a reasonable certainty.*" (Italics ours.) In our view proof by "clear and convincing evidence" would per se be proof sufficient to sustain a charge to a reasonable certainty, and that the quantum of proof required in California is, in effect, no different from that required in Maryland and Alaska. Adopting the rationale of the Supreme Court of Alaska, we declare the quantum of proof in proceedings before the Judicial Standards Commission of this State to be proof by clear and convincing evidence—a burden greater than that of proof of a preponderance of the evidence and less than that of proof beyond a reasonable doubt.

Having determined the quantum of proof for findings upon an inquiry into the conduct of a judicial officer and the scope of our review of the Commission's findings, and having made a detailed review of the record evidence in light of these determinations, we conclude that these findings are established by clear and convincing evidence. We adopt them as our own and additionally make the following findings:

1. Judge Nowell disposed of case #76CR4219 after having received a telephone call at home from Mrs. Vernell T. Grantham, the mother of James Randall Grantham. She told him the boy was guilty; she wanted him punished but didn't want any points on his

driver's license, and somebody had told her that a judge could save points by prayer for judgment or some words to that effect. She asked him to assist her son in the matter of his speeding ticket. Judge Nowell believed Mrs. Grantham to be a poor and deserving widow; and as a result of this telephone call, he resolved to assist her, "if the circumstances warrant." He advised her to meet him before court on the next Monday morning. (This finding is in accord with respondent's testimony.)

2. Judge Nowell acted in case #76CR3975 at the behest of Deputy Sheriff L. E. Martin, who told him he understood it was the boy's first ticket; that he'd "known the boy a right good while, and if there was any way he could help him it would be appreciated." Defendant West worked for Martin's friend, Wilbur, who furnished the money with which Martin paid West's court costs after respondent had disposed of the case. Judge Nowell did not personally know Don Christopher West and testified at the hearing that he had no recollection whatever about the West case.

We have heretofore interpreted and defined the crucial terms of N.C. Const., Art. IV, § 17(2) and Article 30, which are the gravamen in any proceeding to censure or remove a judge. Therefore we advert to principles and definitions heretofore enunciated in determining the disposition of the Commission's recommendation in this proceeding.

[11, 12] *Wilful misconduct in office* is the improper or wrongful use of the power of his office by a judge acting intentionally, or with gross unconcern for his conduct, and generally in bad faith. It involves more than an error of judgment or a mere lack of diligence. Necessarily, the term would encompass conduct involving moral turpitude, dishonesty, or corruption, and also any knowing misuse of the office, whatever the motive. However, these elements are not necessary to a finding of bad faith. A specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith. *In re Edens, supra* at 305, 226 S.E. 2d 5, 9. *See Spruance v. Commission,* 13 Cal. 3d 778, 796, 532 P. 2d 1209, 1221, 119 Cal. Rptr. 841, 853; *Geiler v. Commission on Judicial Qualifications, supra* at 287, 515 P. 2d at 11, 110 Cal. Rptr. at 211; *In re Haggerty,* 257 La. 1, 39, 241 So. 2d 469, 478.

[13] Wilful misconduct in office of necessity is *conduct prejudicial to the administration of justice that brings the judicial office into disrepute.* However, a judge may also, through negligence or ig-

norance not amounting to bad faith, behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute. *In re Edens, supra.* Likewise, a judge may also commit indiscretions, or worse, in his private life which nonetheless brings the judicial office into disrepute. *See, e.g., In re Haggerty, supra* (judge was arrested during a police raid on a party at which, *inter alia,* prostitutes were present and obscene films were being shown.)

The following precepts from our decisions in two similar proceedings are pertinent and controlling here:

[14] "The trial and disposition of criminal cases is the public's business and ought to be conducted in public in open court. *See* N.C. Const., Art. I, § 18. 'The public, and especially the parties are entitled to see and hear what goes on in the court. [That courts are open is one of the sources of their greatest strength.] *Raper v. Berrier,* 246 N.C. 193, 195, 97 S.E. 2d 782, 784 (1957).' " *In re Edens, supra* at 306, 226 S.E. 2d at 9-10.

[15] "A criminal prosecution is an adversary proceeding in which the prosecuting attorney and defendant or his counsel are entitled to be present and to be heard. Failure to accord the prosecutor such opportunity violates the North Carolina Code of Judicial Conduct, Canon 3A(4), 283 N.C. 771, 772, which provides:

" 'A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding.' " *In re Stuhl,* 292 N.C. 379, 389, 233 S.E. 2d 562 (1977).

In the two cases referred to above each of the two judges involved was censured (1) for having improperly excluded the district attorney from participating in the disposition of criminal cases by accepting pleas of guilty and entering judgment outside the courtroom, at a time when court was not in session and without notice to the district attorney; and (2) for having improperly removed the case from the public domain. This, of course, is just what respondent did in the two cases specified in the complaint filed against him. He argues, however, that "assuming he was without authority to act as he did, there was nothing in this behavior to warrant the conclusions of law of the Judicial Standards Commission." He asserts that his conduct "falls far short of censurable behavior," and far short of the conduct for which Judge Edens and Judge Stuhl were censured.

**[16]** Respondent contends: (1) The charges against both Grantham and West were traffic violations for which, under the authority of G.S. 7A-146(8) and G.S. 7A-148, the chief district court judge had authorized magistrates and clerks of court to accept written appearances, waivers of trial, and pleas of guilty upon the payment of the specified fine and court costs. (2) His actions were not done furtively with intent to conceal the disposition he made of the two cases; that he could have entered the same judgment in open court. (3) His motives were not corrupt: in the Grantham case he was motivated by sympathy for a young boy and his widowed, working mother; in the West case, a deputy sheriff had given him a "high recommendation." (4) It had been the practice of other judges in the District to do the same thing.

It is quite true, as respondent contends, that the offenses of Grantham and West were "waiverable" before the clerk or a magistrate. However, had they pled guilty as charged before the clerk he would have entered judgment on their plea, collected from each a fine of $10.00 and $27.00 in court costs, and reported the transaction to the Department of Motor Vehicles. The Department, upon receipt of the records showing the offenses committed, would have assessed three points against Grantham's driver's license and two against West. Under G.S. 20-16 (1975 Supp.), when a licensee accumulates 12 points within a three-year period (fewer under certain circumstances), the Department has authority to suspend his operator's license. Thus, in this instance, the difference in doing business with the judge rather than the clerk was the nonpayment of the ten-dollar fine and the avoidance of the points which the statute specified for the respective offenses.

It is also true that respondent could have pronounced in open court the same judgments he entered in the clerk's office prior to the opening of court. *See State v. Thompson*, 267 N.C. 653, 148 S.E. 2d 613 (1966); *State v. Griffin*, 246 N.C. 680, 100 S.E. 2d 49 (1957). This contention, however, misses the point and denotes insensitivity to the basic principle that the disposition of any criminal case should be made in open court, where the district attorney, if he desires, may be heard. The gravamen of this matter is that the State was not allowed its day in court and that the public was excluded. In each case, had it been regularly heard, the district attorney might have offered evidence which would have disclosed that a "pjc judgment" was inappropriate. In any event after Grantham and West had chosen to bypass the magistrate and the clerk and let the

judge pass on their cases, the district attorney was entitled to be heard and the public was entitled to hear the judgment rendered.

[17]  We are in accord with respondent's assertion that the record contains no evidence that his conduct was directed toward any personal gain and that it does not amount to moral turpitude, dishonesty, or corruption. Indeed, the complaint against him contains no such charge. However, that respondent derived no financial benefit from his actions is wholly irrelevant to the charge filed. Nor do we see any merit in his plea that it has been the practice of other judges in the district to dispose of cases out of court. We are entirely convinced that the *ex parte* disposition of a criminal case out of court, or the disposition of any case for reasons other than an honest appraisal of the facts and law as disclosed by the evidence and the advocacy of both parties, will amount to conduct prejudicial to the administration of justice. In due course such conduct cannot fail to bring the judicial office into disrepute.

The treatment accorded defendants West and Grantham, had the disposition of their cases been made in open court, might well have caused "the objective observer" to wonder why Grantham, guilty of speeding 70 MPH in a 55 MPH zone, and West, speeding 50 MPH in a 35 MPH zone were "given a pjc" when others no more culpable paid the fine and accumulated the points prescribed for the offense. The objective observer, however, upon learning that these judgments had been entered *ex parte* and out of court, would surely think he had reasonable cause to believe that those who knew the judge, or knew a deputy sheriff who knew the judge, could receive more favorable treatment than the average traffic offender. Indubitably, the conduct of any judge which leaves such an impression is prejudicial to the administration of justice and brings the judicial office into disrepute.

As the Maryland court pointed out in *In re Diener*, the court which handles traffic offenses is the place where the average citizen is most likely to have, if not his first, certainly his most frequent contact with our judicial system and to form his lasting opinion of it. "If we give credence to the notion that because an individual parking [or speeding] ticket is of minor importance and that it is somehow permissible for a judge hearing a traffic case to engage in personal or political favoritism, then we condemn the whole judicial system to suspected corruption." *Id.* at 682, 304 A. 2d at 599.

In this State the district court judge fulfills a most important role in our judicial system. He handles more cases than any other

judge and wields great power in the exercise of his court's jurisdiction. The district court has original jurisdiction of all misdemeanors. This means that the judge can sentence a general misdemeanant to prison for a term not to exceed two years. The district court has original jurisdiction of all juvenile matters. *Inter alia*, the judge conducts preliminary examinations to determine probable cause upon felony warrants to make orders as to bail or commitment, to conduct inquiries into the involuntary hospitalization of mentally disordered persons and the appropriateness of sterilization. He hears and passes upon appeals from all magistrates' judgments. In civil matters the district court has concurrent jurisdiction with the superior court, but the district court division is the proper division for the trial of all civil actions in which the amount in controversy is five thousand dollars or less. It is the proper division for the trial of proceedings for annulment, divorce, alimony, child support and child custody, and appeals in these matters go directly to the Court of Appeals.

The power of the district court over the lives and everyday affairs of our citizens makes it imperative that the district court judges of the State not only be fully capable but also dedicated to carrying out their official responsibilities in accordance with the law and established standards of judicial conduct.

[18] For the reasons stated herein we conclude that respondent's disposition of criminal cases No. 76CR3975 and No. 76CR4219 constituted wilful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute in that he (1) improperly deprived the district attorney of the opportunity to participate in their disposition; (2) improperly removed the proceedings from the public domain; and (3) violated Canon 3(A)(4) of the North Carolina Code of Judicial Conduct. For this conduct respondent merits censure in accordance with the recommendation of the Judicial Standards Commission.

Now, therefore, it is ordered by the Court in Conference that Judge W. Milton Nowell be and he is hereby censured by this Court for the conduct specified in the Commission's recommendation.

This the 12 day of September 1977.

Justice LAKE dissenting.

I dissent for the reasons stated in my dissenting opinion in *In Re Crutchfield*, 289 N.C. 597, 223 S.E. 2d 822 (1975).